# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| **RANDY BLANCHARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil No.** |
| | ) | **08-40073-FDS** |
| **v.** | ) | |
| | ) | |
| **MATTHEW C. SWAINE, GEORGE** | ) | |
| **BRUWER, CITY OF LEOMINSTER,** | ) | |
| **CHIEF OF POLICE PETER F. RODDY,** | ) | |
| **and DOES 1-5,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE AND PLAINTIFF'S
## MOTIONS TO FILE SUPPLEMENTAL MATERIALS AND TO EXCLUDE EXPERT
## TESTIMONY

This is a civil rights action arising under 42 U.S.C. § 1983 against various police officers and the City of Leominster. In 2005, a police cruiser driven by officer Matthew Swaine hit plaintiff Randy Blanchard as he fled to avoid an arrest for shoplifting. Blanchard contends that Swaine violated his constitutional rights and committed a battery, and that Swaine's supervisors and the city are liable on various theories, including failure to provide proper oversight and failure to train.

Defendants have moved for summary judgment and to strike certain parts of the evidentiary record, including expert testimony. Blanchard has moved to exclude expert testimony, to allow additional argument and factual statements, and to file a supplemental affidavit. For the reasons set forth below, plaintiff's motion to allow additional argument and factual statements will be denied, and his motion to exclude expert testimony will be denied

without prejudice. That portion of defendants' motion to strike related to expert testimony will also be denied without prejudice, while the remainder will be granted in part and denied in part. Defendants' motion for summary judgment will be granted in part and denied in part.[1]

## I.    Background

The facts are presented in the light most favorable to plaintiff.

### A.    The Initial Response

Matthew Swaine is a police officer with the City of Leominster, Massachusetts. On June 29, 2005, between 5:00 and 5:50 p.m., Swaine received a call from personnel at a Sears store requesting his help in apprehending a fleeing shoplifter. (Def. Facts ¶ 10, Ex. 7). En route, Swaine received information that the suspect was carrying a black backpack and had jumped a nearby fence into Evergreen Cemetery. (*Id.* ¶ 11).

Upon reaching the area, Swaine drove his police cruiser into the cemetery along a paved access road, descending a hill. (*Id.* ¶ 13; Pl. Facts ¶ 12).

Meanwhile, Blanchard was crossing the same access road and heading uphill. He was running away from two Sears loss-prevention officers, Sean St. Cyr and Paul Hartin, who were pursuing on foot. (*Id.* ¶ 32).[2] Blanchard crossed the access road a "substantial ways away" from Swaine's vehicle, which was coming down the road toward him. (*Id.* ¶ 21). At the opposite edge of the road, he spotted the cruiser as it came around a large tree. (Def. Facts Ex. 1 at 35-

---

[1] The Court's decisions on these motions renders moot Blanchard's motion to file a supplemental affidavit.

[2] There is a factual dispute as to how far away the loss-prevention officers were from the site of the collision.

36).[3]  He decided to change direction and flee back across the road because he was too winded to continue uphill.  (*Id.* Ex. 1 at 36-37).  He turned away from the cruiser and "darted" across the road while the cruiser was still a "substantial ways away."  (Pl. Facts ¶ 21).

## B.    The Collision

Approximately three to six seconds after he began to cross the road, Blanchard was struck by Swaine's cruiser.  (*Id.* ¶¶ 21, 22).[4]  Blanchard contends that Swaine did not brake to avoid him.  (*Id.* ¶ 26).[5]  The cruiser's estimated speed at impact was 20 to 25 miles per hour.  (*Id.* ¶ 23).[6]  Blanchard was running "at a right angle" to Swaine's vehicle at the time.  (*Id.* ¶ 27).

On impact, the cruiser's push bar hit Blanchard and knocked him in the air.  (*Id.* ¶¶ 23, 51).  He rolled up onto the hood and off the driver's side of the cruiser onto the ground.  (*Id.* ¶ 35).

At the time of the collision, the Sears officers were standing on the other side of a fence and down a forested slope.  (*Id.* Ex. 20 at 32-34, 56).

## C.    Aftermath

As Blanchard lay on the ground, Swaine got out of the cruiser.  (*Id.* ¶ 37).  Blanchard contends that Swaine looked down and said, "I didn't mean to hit you that hard."  (*Id.*).

---

[3] Blanchard appears to have given conflicting testimony as to when he first saw the police cruiser.  (*See* Def. Facts Ex. 1 at 33, 35-36; Pl. Facts ¶ 19).

[4] Defendants contend that prior to the collision Swaine was distracted by the sight of the pursuing loss prevention officers.  When he turned his eyes back to the road, he "saw [Blanchard] running directly at his cruiser and no more than fifteen to twenty feet away."  (Def. Facts ¶ 19).

[5] Defendants dispute this.  Swaine says he immediately applied his brakes and turned his cruiser to avoid Blanchard.  (Def. Facts ¶¶ 23-26).

[6] Swaine estimates that his speed upon impact was "less than 15-20, because the brakes were applied already."  (Def. Facts Ex. 2 at 73).

Blanchard also contends that Swaine put his foot on Blanchard's chest and tried to make him lie down. Blanchard told Swaine that the foot hurt him and that it hurt too much to lie down. (*Id.*).[7] Swaine called an ambulance and his supervisor, defendant Sergeant George Bruwer. (Compl. ¶ 26). Several minutes later, medical personnel arrived in an ambulance. Shortly thereafter, Sergeant Bruwer arrived at the scene. (Def. Facts ¶ 42). Blanchard was loaded onto a gurney and taken to the hospital. (Pl. Facts ¶ 45).

**D.    Blanchard's Injuries and Treatment**

As a result of the incident, Blanchard's left shoulder was dislocated and he suffered fractures in his left shoulder and right hip. (Compl. ¶¶ 32, 33). In July 2005, he underwent arm and shoulder surgery to repair a four-part humeral fracture. (*Id.* ¶ 34). In November 2006, he needed hip replacement. (*Id.* ¶ 41). Blanchard's injuries required months of therapy at the Lemuel Shattuck Hospital, and he incurred medical bills exceeding $150,000. (Compl. ¶¶ 36, 42). He contends that he continues to suffer debilitating chronic pain and a permanent limp. (*Id.* ¶ 32; Pl. Facts ¶ 89).

**E.    Swaine and Bruwer's Reports and Chief Roddy's Review**

Swaine filed an incident report after the collision. The report included events leading up to and including the collision, noted that Blanchard "was in obvious pain," and included statements and addresses of witnesses. (Def. Facts Ex. 7).

Based on his investigation of the incident, Bruwer prepared a "Motor Vehicle Crash Report" that included the names of witnesses and a non-scale diagram of the collision that estimated distances and the relative positions of the cruiser and Blanchard. (*Id.* Ex. 12). He did

---

[7] Defendants deny that any of this happened and contend that Swaine only instructed Blanchard not to move. (Def. Facts ¶¶ 35, 36).

not note any damage to Swaine's cruiser, but did note two blood smudges on the left side of the hood leading up to the windshield. (*Id.* Ex. 7). He also noted that there were no skid marks on the ground. (*Id.*). Bruwer also visited Blanchard at the hospital and asked him some questions. (Pl. Facts ¶ 49).

In the course of his investigation, Bruwer made no inquiries about the extent of Blanchard's injuries. (*Id.*). He never asked Swaine whether he had used the car to stop Blanchard's flight. (*Id.* ¶ 52). He did not take photographs of the incident site and did not consider calling a detective to the scene. (*Id.* Ex. 26 at 49).

As a result of the investigation and reports, Bruwer concluded that the collision was accidental. (Def. Facts ¶ 52). Neither Bruwer nor Swaine prepared a separate use-of-force report for the incident. (Pl. Facts ¶ 65).

Defendant Police Chief Peter Roddy knew of the incident within 24 hours of its occurrence. (Def. Facts ¶ 53). He reviewed the reports by Swaine and Bruwer. (*Id.* ¶ 54). No disciplinary action was taken against either Swaine or Bruwer as a result of the incident.

F.      **Leominster Police Department Policy and Practice**

At the time of the incident, the Leominster Police Department ("LPD") had no internal affairs office for investigating complaints against officers. (Pl. Facts ¶ 91).[8] Instead, review of complaints was usually overseen or conducted by high-ranking personnel within the department, including the police chief, captain, and shift commanders. (Def. Facts ¶ 82).

Officers of the LPD (including Swaine) received training on the use of force and the

---

[8] At the time of the collision, the LPD had 95 employees, of whom 70 to 75 were officers. (Def. Facts ¶ 58).

department policies regarding such use. (Def. Facts ¶¶ 59, 62). Officer training before the incident included instruction on the force continuum, which addresses the level of force appropriate at each level of suspect resistance. (*Id.* ¶ 63). Officers were also trained on the preparation and filing of incident reports. (*Id.* ¶ 64).

The LPD has an official policy on the use of force. (*See* Def. Facts Ex. 16). Among other things, the policy requires that a separate "use of force" report, with its own review process, be filed for non-deadly uses of force when a suspect suffers obvious physical injury or complains of an injury. (*Id.*). The policy requires that the report include the names and addresses of victims and witnesses, the extent of treatment of injuries, the name of the treatment facility and physician administering treatment, and the reasons and circumstances that required the use of force. (*Id.*). The policy also requires that a supervisor respond to the scene of an alleged injury and determine if a detective should be called to investigate and whether photographs, measurements, and diagrams should be created. (*Id.*). The entire file is then forwarded to the chief of police or his designee, who is responsible for ensuring that a proper and thorough investigation was conducted and that the use of force complied with department policy and procedures. (*Id.*).

At the time of the collision, the actual practice at the LPD was that information that (according to the written policy) should have been filed in a separate "use of force" report was instead included in an incident report. (Def. Facts ¶ 76). If a police officer filed an incident report, the on-duty officer in charge was responsible for reviewing it and then preparing a "separate narrative disclosing any medical treatment for the individual." (*Id.* ¶¶ 77, 78). Chief Roddy testified that he would "usually" receive notification if someone had been injured. (*Id.*

Ex. 4 at 44).  He would then ensure a high-level review of the filed report, the treatment received by the injured person, and the circumstances surrounding the injury.  (*Id.* ¶ 81).

The LPD also had a process for handling civilian complaints, although there was no system for tracking multiple complaints over time.  (*Id.* ¶¶ 84, 85; Pl. Facts ¶ 91).  Disciplinary action could result from any complaint or internal review process.  (Def. Facts ¶¶ 84, 85).

At the time of the collision, the City did not have any reports or complaints on file against Swaine, with only one exception:  an off-duty incident where Swaine restrained and threatened two teenagers who threw snowballs at his car.  (*Id.* ¶ 56, Ex. 14).  The LPD investigated that complaint and required Swaine to take corrective action.  At the time of the collision, the City did not have any reports against Sergeant Bruwer for improper supervision of officers under his control.  (*Id.* ¶ 57).

## II. <u>Standard of Review</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

7

As a general matter, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). Under Rule 56(e), affidavits, although not themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. Fed. R. Civ. P. 56(e). A motion to strike is the proper vehicle for challenging the admissibility of information contained in an affidavit. CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 2738, at 372 (3d ed. 1998). The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection. *Casas Office Machs., Inc. v.. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994). The court should disregard only those facts in the affidavit that are inadmissible and consider the rest of it. *Id.*

III. **Analysis**

A. **Blanchard's Motion to File Supplemental Materials**

Blanchard has filed a "Motion for Leave to File Supplemental Memo of Law and Statement of Material Fact with Exhibits." In that motion, he requests that the Court allow him to file an additional twelve pages of argument on his opposition to summary judgment and an additional nine pages of alleged material facts. Defendants contend that the submission was untimely, exceeded the scope of the parties' conference discussions under Local Rule 7.1, and is based on immaterial or inadmissible evidence.

Without reaching these arguments, the Court will deny the motion. None of the additional arguments or facts would affect the Court's decision on summary judgment, and the

issue is therefore moot.[9]  Accordingly, the Court will not allow the filing nor consider the additional arguments or facts contained therein.

> B.        **The Parties' Motions Related to Expert Materials**

Both parties dispute the expert materials submitted by their opponents, contending, among other things, that the reports fail to consider important evidence.  Blanchard couches his arguments as a motion to exclude expert testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), while defendants have included their arguments in their motion to strike.[10]

Even without considering the expert reports, Blanchard has presented sufficient evidence to overcome a motion for summary judgment for the majority of his claims, as indicated below. For those claims that do not survive summary judgment (negligent hiring and retention and supervisory liability against Bruwer), expert testimony is not relevant to the Court's decision. The Court therefore will not consider expert testimony for the purposes of determining the summary judgment motion, and will deny the motions to exclude or strike expert testimony. That denial, however, is without prejudice to the raising of the same or similar issues prior to the trial in accordance with the timetable set by the Court.

> C.        **Defendants' Motion to Strike**

Defendants have moved to strike portions of Blanchard's opposition to summary

---

[9] As set forth below, the Court is denying summary judgment on all claims except those for negligent hiring and retention (Count 3) and supervisory liability against Bruwer (Count 5).  Blanchard's proposed supplemental materials make no additional arguments regarding negligent hiring and retention.  The materials provide additional factual evidence on a theory of supervisory liability, but that theory will be dismissed as a matter of law.

[10] The Court notes that the deadline for defendants to file a motion to exclude expert testimony under Rule 702 or *Daubert* has not yet passed.  In its July 22, 2010 order, the Court set a deadline of no later than 14 days after the filing of this order on summary judgment.

judgment, including parts of his statement of material facts and his response to defendants' statement of material facts. Defendants target three types of items: (1) statements that are allegedly unsupported by specific references to the evidence, as required by Fed. R. Civ. P. 56(e)(2) and Local Rule 56.1; (2) statements that rely on reports by Blanchard's various experts; and (3) photographs of Blanchard's injuries and of the cemetery where the collision occurred.

## 1.     Failure to Confer Pursuant to Local Rule 7.1

As a preliminary matter, Blanchard contends that defendants' motion to strike is deficient because it lacks the certificate required by Local Rule 7.1(a)(2). That rule provides that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." Loc. R. 7.1(a)(2). Relying on *Converse, Inc. v. Reebok Int'l, Ltd.*, 328 F. Supp. 2d 166 (D. Mass. 2004) and *Abrazinski v. Dubois*, 876 F. Supp. 313 (D. Mass. 1995), Blanchard argues that the failure of defendants' counsel to confer in this case justifies summary denial.

Even assuming that defendants' counsel failed to confer as required by Local Rule 7.1, summary denial of the motion is not warranted in this case. *See Converse*, 328 F. Supp. 2d at 174 n.7 ("[A]lthough a litigant's failure to observe the Local Rules invites sanctions, omitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial.") (citing *Gerakaris v. Champagne*, 913 F. Supp. 646, 651 (D. Mass. 1996)). There can be no doubt that Blanchard would have opposed the motion to strike, and discussion would not have likely resolved or narrowed any of the issues involved. Accordingly, there is no reason for summary denial for failure to consult counsel pursuant to Rule 7.1. The Court will therefore turn to defendants' substantive arguments concerning the motion to strike.

## 2. <u>Responses to Statement of Facts</u>

Defendants contend that certain factual statements in Blanchard's opposition should be struck because they are unsupported by specific references to admissible evidence in the record as required by Fed. R. Civ. P. 56 and Local Rule 56.1. Specifically, defendants seek to strike Blanchard's responses to paragraphs 19, 23-26, 29, and 32-34 of defendants' statement of facts.

As to paragraphs 19 and 29, Blanchard denies the contention that Swaine was distracted by the Sears officers St. Cyr and Hartin running in the distance. That denial, however, has adequate evidentiary support. In addition to expert testimony (not considered here), Blanchard cites St. Cyr's testimony as to where he and Hartin were positioned at the time of the collision. St. Cyr's deposition testimony suggests that he was on the other side of a fence and down a slope. Whether Swaine was distracted may turn on whether he could credibly have seen St. Cyr and Hartin from his cruiser, and St. Cyr's testimony casts sufficient doubt on the question to support Blanchard's denial of that statement.

As to paragraph 23, Blanchard denies that Swaine applied the brakes prior to the collision. The question of whether Swaine applied the brakes relates in part to the speed at which the cruiser was traveling when it hit Blanchard. In support, Blanchard cites witness testimony that the cruiser was traveling at 20 to 25 miles per hour when it hit him, and this directly conflicts with Swaine's testimony that his cruiser was traveling only 15 to 20 miles per hour because he had applied the brakes. By itself, that is enough to create a genuine issue of fact and support Blanchard's denial.

As to paragraph 24, Blanchard denies that "Officer Swaine turned his cruiser to avoid [Blanchard]." There is no dispute that Swaine turned his cruiser at least once, and Blanchard

points to nothing in his response to indicate otherwise.  However, Swaine's motivation in turning the cruiser is a disputed issue.  Blanchard contests that Swaine had the purpose of avoiding him by pointing to witness testimony that he turned his cruiser only once (rather than twice as Swaine contends) and that there were no sounds of braking.  Drawing reasonable inferences in favor of Blanchard, this testimony is sufficiently inconsistent with Swaine's stated motivation to support his denial as to that portion of the statement.

As to paragraph 25, Blanchard denies that he changed directions and turned into the path of the cruiser.  In support, Blanchard cites his own deposition testimony, in which he denies this and states that Swaine's cruiser ran into him.  This is again sufficient to support Blanchard's denial.

As to paragraph 26, Blanchard denies that "Officer Swaine, without losing sight of [Blanchard], 'applied the brakes and [turned the cruiser with] a quick jog to the right' to avoid [Blanchard]."  The direction that Swaine turned the cruiser is disputed by Blanchard's testimony that the cruiser turned left into him.

Defendants' paragraphs 32, 33, and 34 each state that St. Cyr observed something about the collision.  Blanchard contends that St. Cyr's observations are not credible.  The issue of St. Cyr's credibility is one for the jury at trial, and cannot form the basis of a motion to strike.

In summary, Blanchard's denial of the factual allegations set forth in paragraphs 19, 23-26, 29 and 32-34 are sufficiently supported by admissible evidence in the record and need not be struck.[11]

_____

[11] Defendants seek to strike other portions of Blanchard's statement of facts, "including but not limited to" ¶¶ 35, 45, and 60.  However, they fail to address the deficiencies in these paragraphs directly.  Without more in the way of argument, the Court declines to consider those arguments.

### 3.    References to Expert Reports

Defendants next move to strike all of Blanchard's references to expert reports.  As discussed above, the Court will not consider any expert reports in connection with the summary judgment motion, and the motion is therefore moot.

### 4.    References to Photographs

Finally, defendants move to strike several photographs submitted by Blanchard as part of his opposition to summary judgment.  The Court will grant defendants' motion to strike the photographs because they have not been properly authenticated.

In order to be admissible at trial, a document must be authenticated.  Fed. R. Evid. 901(a).  Generally, authentication requires competent testimony concerning the document.  *See* Fed. R. Evid. 901(b)(1).  Certain categories of documents are self-authenticating under Fed. R. Evid. 902 and require no extrinsic testimony.  Each document submitted in support of summary judgment must either be properly authenticated, or must be self-authenticating under the Federal Rules.  *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000).  The authentication requirement is rarely onerous; in many instances, a single sentence will suffice, indicating that the document is what it appears to be.

Blanchard has submitted no testimony regarding the authenticity of the photographs on the record.  A simple statement in an affidavit—e.g., "Attached as Exhibit 9 is a photograph of Randy Blanchard's shoulder scar, taken at the hospital after his surgery"—would have been sufficient.  No such affidavit has been submitted to the Court.  In the absence of any authenticating evidence, the photographs will be struck.

The Court next turns to the substance of defendants' motion for summary judgment.

D.      **Defendants' Motion for Summary Judgment**

1.      **Claims Arising out of the Collision**

a.      **§ 1983 Claims Against Swaine (Count 2)**

Blanchard contends that Officer Swaine used excessive force when he struck him with his police cruiser and again when he used his foot to hold Blanchard against the ground.[12] Excessive force claims arising out of arrests are analyzed under the Fourth Amendment's protection against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002). In order to establish such a claim, the plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth Amendment; and that (2) the use of force during the seizure was unreasonable.[13] *Graham*, 490 U.S. at 395.[14]

Claims of excessive force are judged against an "objective reasonableness" standard. *Graham*, 490 U.S. at 397. The reasonableness of the force is determined by balancing the level of force used with the government's interest in public safety. *Id.* at 396. The government's interest is not judged with the benefit of hindsight; rather, it is "the perspective of a reasonable officer on the scene" at the time. *Id.* Therefore, depending on the officer's real-time

---

[12] The complaint is unclear as to whether Blanchard has also brought claims based on an alleged violation of due process, summary punishment, and denial of access to medical care, and Blanchard did not address defendants' arguments as to those issues in his summary judgment response. To the extent those claims have been brought, they are either waived or unsupported by the record.

[13] The right to make an arrest carries with it the right to use some degree of force. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Only excessive force is actionable; "not every push or shove rises to the level of a constitutional violation." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990).

[14] A claim under § 1983 requires proof that the defendant was acting "under color of state authority" at the time of the alleged violation. *Albright v. Oliver*, 510 U.S. 266, 315 (1994). Defendants do not dispute that this requirement is met here.

understanding of the severity of the suspected offense, the potential danger the suspect poses to the officer and the public, and whether or not the suspect is actively resisting arrest, more or less force may be objectively reasonable in any given case. *Id.*; *see also Bastien* , 279 F.3d at 14. The officer's subjective intent or motivation is not relevant to the reasonableness inquiry. *Bastien*, 279 F.3d at 14 (citing *Alexis v. McDonald's Rests.*, 67 F.3d 341, 352 (1st Cir. 1995)). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Under this standard, Blanchard has clearly made out a case sufficient to survive summary judgment. Blanchard contends that Swaine intentionally hit him with his cruiser. Among other things, he alleges that Swaine said "I didn't mean to hit you that hard" after the collision. He points to witness testimony that there were no braking sounds and that Swaine's car was traveling 20 miles per hour when it hit him. A reasonable jury could find that this was a "seizure." *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result."). A reasonable jury could also find that this seizure was unreasonable. At the time of the collision, Swaine knew that Blanchard was a suspected shoplifter evading arrest. However, he did not have information that Blanchard was armed in any way or otherwise presented a deadly threat. In those circumstances, a reasonable jury could find that the use of a police cruiser to stop pursuit was unreasonable.

Accordingly, summary judgment as to Blanchard's § 1983 claims will be denied.

### b.      Battery Claim Against Swaine (Count 1)

To establish a claim for battery in Massachusetts, the plaintiff must prove "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 141 (D. Mass. 2007), *aff'd*, 550 F.3d 166 (1st Cir. 2008); *Commonwealth v. McCan*, 277 Mass. 199, 203 (1931). Police officers, however, "may use such force as is reasonably necessary to effect the arrest." *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991) (citing *Julian v. Randazzo*, 380 Mass. 391, 396 (1980)). This exception for police use of force amounts to a "reasonableness" test for battery claims, and "the identical reasoning which constrained [the] determination that the officers' use of force was objectively reasonable in [F]ourth [A]mendment terms . . . controls the 'reasonableness' determination required on [the plaintiff's] common law claims of assault and battery as well." *Id.*

The reasonableness analysis of Blanchard's § 1983 claim therefore applies to the battery claim, which will survive summary judgment for the same reasons.

### c.      Qualified Immunity as to Counts 1 and 2

Defendants contend that Swaine is nonetheless entitled to qualified immunity for his actions. The Supreme Court has held that federal public officials who exercise discretionary functions are generally entitled to qualified immunity from liability for damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The same qualified immunity is applicable to § 1983 claims against state officials. *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984). In order to establish immunity, the public official must show that his actions "[do] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

16

*Harlow*, 457 U.S. at 818. Therefore, the pivotal question is "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir. 1991).

Here, the right of a citizen to be free from an unreasonable seizure was a clearly established right at the time of the incident. In fact, officers at the LPD were trained in the force continuum, which described the level of force appropriate at each level of suspect resistance. Moreover, it would have been unreasonable for an officer to believe that his use of a police cruiser to stop pursuit was acceptable under the circumstances of this case, and a reasonable jury could find that such use violated Blanchard's constitutional rights. Drawing all reasonable inferences in favor of Blanchard, therefore, the Court finds that qualified immunity is not a bar to the § 1983 and battery claims against Swaine.

## 2.    Policy and Practice of the LPD

### a.    Municipal Liability Claims Against the City (Counts 4 and 5)

Counts 4 and 5 seek damages against the City of Leominster under a theory of municipal liability. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Under *Monell* and its progeny, local governments can be held liable for alleged constitutional deprivations when those deprivations arise from a governmental policy or practice. In addition to establishing a constitutional deprivation, the plaintiff must show that: (1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, and practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or

practice was the direct cause of the alleged constitutional violation. *DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell*, 436 U.S. at 690-92.[15]  Practices that are not officially authorized may nonetheless be actionable under *Monell* if they are "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005); *see also Monell*, 436 U.S. at 691 (informal practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law").

Blanchard's *Monell* claims rest on three separate theories.  He contends (1) that the City failed "to enforce a minimally acceptable program of supervision and discipline," (2) that the City and its policymakers "have a long-established policy and custom of not investigating critical incidents," and (3) that the City and its policymakers "have a long-established policy and custom of not adequately training officers on proper use of force."  (Compl. ¶¶ 91-93, 97-98). Because the first two theories turn on the same evidence, the Court will address the failure to supervise and discipline and the failure to investigate theories together, and then address the failure to train theory.

### i.    Failure to Supervise, Discipline, and Investigate

Defendants deny that the City had a custom or policy of inadequately supervising, disciplining, and investigating its officers.  They note that the record reveals no instances where an officer should have been disciplined and was not.  They also point to the LPD's practice of

---

[15] A threshold issue under *Monell* is whether the policy, practice, or custom was established by an individual or entity with the authority to make official City policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 483 (1986).  This issue is not addressed by either of the parties on summary judgment, although defendants reserve the right to challenge Blanchard's claims on these grounds.

requiring written reports for each incident, its mechanism for review of each incident report, and the fact that the chief of police had notice of and ultimately oversaw an investigation into the events of this incident. In response, Blanchard contends that the City's consistent failure to follow its written policies illustrated deliberate indifference to the rights of citizens and was a direct cause of his injuries.

Chief Roddy and others essentially admit that department practice was to disregard official written policies on reporting the use of force. For example, section XIII of the written policy states that "a separate Use of Force Report will be completed in addition to the arrest or incident report" when "the application of non-deadly force results in obvious physical injury to the suspect, the suspect requests medical treatment for an injury . . . or the suspect complains of an injury."[16] At the time of the collision, the LPD apparently did not follow this policy. Instead, information that—under the written policy—would have been filed in a separate use-of-force report was instead included in the incident report. Another section of the policy requires the patrol supervisor to assess the need to have a detective respond to the scene of a complained injury. According to Sergeant Bruwer, however, he did not consider whether a detective should be called because "that's not what we do." (Pl. Facts Ex. 26 at 49). Finally, there is evidence from which a jury could conclude that Chief Roddy did not always review reports of injuries, as defendants allege. When asked specifically, "would there be times where a person was obviously injured, and you would not necessarily learn that this person was injured . . . . [o]r

---

[16] Defendants suggest that Section XIII applies only to conscious "use" of force by the officer, and that it would not apply in the case of an accidental collision. However, in light of Section XII—which states that "[w]henever a member of this Department takes an action that . . . is alleged to have resulted in, injury or death of another person . . . he shall file written reports . . . according to the procedures outlined in Section[] XIII . . ."—a reasonable jury could find that the written policy required a separate use-of-force report to be filed in this case.

would you always receive notification of that?," Chief Roddy specifically testified, "If someone was injured, I would usually receive notification of that."  (Def. Facts Ex. 4 at 43-44).

The question here, however, is not simply whether the LPD followed its own written policies.  Rather, it is whether a reasonable jury could infer that the LPD's failure to follow its written policies was the direct cause of Blanchard's injuries.  Under the circumstances presented here, the Court concludes that a reasonable jury could do so.

The mere failure of a municipality to follow its written policies, without more, is normally insufficient to establish the necessary causal link.  *See Gailor v. Armstrong*, 187 F. Supp. 2d 729, 735 (W.D. Ky. 2001) (failure to follow prison videotaping policy insufficient where incident was in fact videotaped); *Dettelis v. City of Buffalo*, 3 F. Supp. 2d 341, 347 (W.D.N.Y. 1998) (failure to conduct police searches at a particular location insufficient where location was irrelevant to whether illegal searches occurred).  Indeed, it is doubtful that there is a perfect congruence in any municipality between its written policies (which are often set out in a three-ring binder on a shelf) and the policies as implemented in the field (which often occurs under fast-paced and difficult circumstances).  But there are at least two relevant ways, alone or in conjunction with one another, in which such a connection could be drawn.

The first is where a city's failure to follow its written policies prevents its management from becoming aware of incidents as they arise and implementing appropriate training and discipline in response.  *See Beck v. City of Pittsburgh,* 89 F.3d 966, 974-75 (3d Cir. 1996) (inadequate investigations guaranteed repeated impunity of officers); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 330-31 (2d Cir. 1986) (policy of deliberate indifference, characterized by failure to properly investigate excessive force claims, caused officer disregard of

constitutional principles); *Clark v. Pena*, 2000 WL 35427177, at *7 (W.D. Mich. Apr. 28, 2000) (failure to track complaints created "an environment where officer misconduct could go unchecked"); *see also Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1233 (D. Me. 1996) (failure to properly investigate events surrounding arrest could support a finding of deliberate indifference).  Here, the Leominster police did not normally file a separate use-of-force report, did not send a detective to investigate use-of-force incidents, and "usually" (but not always) informed the chief of police of such incidents.  A factfinder might reasonably conclude that the LPD was not taking steps to ensure that it was informed of problems as they arose, and thus could not implement appropriate training and discipline in response.  It is true, of course, that there is no evidence that the LPD had a history of the use of excessive force, or a history of failing to discipline wayward officers.  But that same evidence might be said to support the argument that the LPD was not keeping itself fully informed, rather than refute the causative link.  *See Clark*, 2000 WL 35427177, at *7 (absence of prior complaints could suggest that procedures were highly effective at stifling them).

The second way a causal connection could be drawn is where a city's failure to follow its written policies sends a message to officers that rules will not be strictly enforced and that officer violations will not be disciplined.  *See Fiacco*, 783 F.2d at 331 (officers could have viewed city's failure to implement investigative procedures as reflecting indifference to use of force); *Clark*, 2000 WL 35427177, at *9 (police department's lax customs could have led officers to use excessive force); *Comfort*, 924 F. Supp. at 1233 (police chief's management style created an atmosphere in which officers believed that he would not punish their use of excessive force).  Although this case does not present highly egregious circumstances of institutional misconduct,

a reasonable jury could nonetheless draw such an inference here. *Cf. Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989) (unconstitutional police custom of breaking down doors without warrant caused use of excessive force against hotel room occupants).

In summary, a reasonable factfinder could conclude under the circumstances that the City's failure to follow its written policy could have constituted the direct cause of Blanchard's injury.[17] Summary judgment will therefore be denied with regard to the claims of failure to supervise, discipline, and investigate.

### ii.    Failure to Train

Blanchard also contends that the City failed to train its officers adequately on the proper use of force. In response, defendants contend that the record demonstrates that officers received adequate training on the use of force both prior to and during their tenure at the police department.

Under *Monell*, "any proper allegation of failure to train . . . must allege that [the officer's] lack of training caused him to take actions that were objectively unreasonable and constituted excessive force" and that "the identified deficiency in [the training program was] closely related to the ultimate injury." *Young v. City of Providence*, 404 F.3d 4, 26-27 (1st Cir. 2005) (internal quotations, citations, and textual alterations omitted).

Even reading the facts in the light most favorable to Blanchard, the record is insufficient to establish a claim of inadequate training on proper use of force. It is undisputed that Swaine and other officers received training on the use of force both before and during their tenure at the

---

[17] The LPD's departure in practice from the official written policy could also support a finding of deliberate indifference. *See Comfort*, 924 F. Supp. at 1233 (police chief's management style and failure to investigate scene of arrest could support a jury finding of deliberate indifference). *See also Fiacco*, 783 F.2d at 327 (treating deliberate indifference and causation as a single analysis).

LPD.  In his deposition testimony, Swaine demonstrated an awareness of the rules regarding use of force and testified that those rules clearly prohibit the intentional use of a police cruiser to stop pursuit in the circumstances of the instant case.  Any decision to employ such force would thus have been a clear violation of his training.  *Monell* requires that "the deficiency in training actually [cause] the police officers' indifference," and the City cannot be held responsible for an officer's independent decision to disregard the training given to him.  *See Whitfield,* 431 F.3d at 10 (citing *City of Canton*, 489 U.S. at 390-91).[18]

Accordingly, summary judgment on plaintiff's *Monell* claims will be granted to the extent they rely on a theory of failure to train.

### b.    Negligence Claims under Mass. Gen. Laws ch. 258

Blanchard contends that the City is liable under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, for his injuries, which were "a direct and proximate result of the negligent conduct of employees of the City of Leominster."  (Compl. ¶ 87).  Specifically, he states that Swaine "recklessly injured" him and that Roddy and Bruwer were negligent in "hiring, training, supervising, disciplining, and retaining police officers employed by the city, including [Swaine]."  (*Id.*).  In response, defendants contend that Blanchard's claims are barred by Mass. Gen. Laws. ch. 258 § 10 (j), (h), and (b).

The Massachusetts Tort Claims Act provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment."

---

[18] Blanchard does not appear to argue that the LPD's failure to train its officers on the use-of-force *reporting* was constitutionally deficient.  Even if he had, inadequate training on reporting would not have been a direct cause of the constitutional violation since the rest of Swaine's training clearly prohibited the use of his cruiser as an instrument of force in these circumstances.

Mass. Gen. Laws ch. 258, § 2 (2005); *see also Spring v. Geriatric Auth. of Holyoke*, 394 Mass.

274, 283, 285 (1985) (noting that the Act effectively removes the defense of immunity in certain

tort actions against public employers).[19]

Before proceeding to the merits, the Court will first address defendants' arguments that

the claims are barred by various statutory provisions.

### i.        Section 10(j)

Defendants first contend that the claims are barred by section 10(j) of the Massachusetts

Tort Claims Act.  That section provides that the City cannot be liable for

> any claim based on an act or failure to act to prevent or diminish the harmful
> consequences of a condition or situation, including the violent or tortious conduct
> of a third person, which is not originally caused by the public employer or any
> other person acting on behalf of the public employer.

Mass. Gen. Laws. ch. 258 § 10(j).  Defendants argue that Blanchard's claims should be barred to

the extent they are based on a failure to prevent or mitigate harm.  This bar does not apply to the

current circumstances, because—at least on Blanchard's version of the facts—the collision was

caused by Swaine while he was acting on behalf of the City.  *Cf. Anagnos v. Hultgren*, 445 F.

Supp. 2d 184, 189 (D. Mass. 2006) (no liability under 10(j) where decedent was struck and killed

by suspect fleeing police).  Accordingly, this case falls within the "original cause" exception to

section 10(j).

### ii.       Section 10(h)

Defendants further contend that the claims are barred by section 10(h).  That section

---

[19] There is no dispute that the City is a public employer.  A condition precedent to bringing suit against a
public employer under the Act is the presentment of a claim "in writing to the executive officer of such public
employer within two years after the date upon which the cause of action arose."  Mass. Gen. Laws ch. 258 § 4.
Here, it appears to be undisputed that Blanchard made such a presentment to the City on March 23, 2007.  (Compl. ¶
88).

provides that the City cannot be liable for

> any claim based upon the failure to establish a police department or a particular police protection service, or if police protection is provided, for failure to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes, identify or apprehend criminals or suspects, arrest or detain suspects, or enforce any law, *but not including* claims based upon the negligent operation of motor vehicles, negligent protection, supervision or care of persons in custody . . .

Mass. Gen. Laws. ch. 258 § 10(h) (emphasis added).  Again, that provision does not appear to apply to this case.  The statute is directed to various forms of police failures, whereas this claim involved an allegation of deliberate conduct.  The claim against Swaine falls—at least in part—into the exception for negligent operation of motor vehicles,[20] and the claims against Bruwer and Roddy focus on the hiring and supervision of police officers, not on investigation of crimes.

### iii.    Section 10(b)

Defendants next contend that the claims are barred by section 10(b).  That section provides that the City cannot be liable for

> any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused . . .

Mass. Gen. Laws ch. 258 § 10(b).  Defendants contend that the level of training and supervision police officers receive represents discretionary policymaking and planning and is protected by the statute.

Section 10(b) excludes liability on a narrow range of conduct that involves policymaking

---

[20] The Massachusetts Tort Claims Act provides immunity for intentional torts.  *Armstrong v. Lamy*, 938 F. Supp. 1018, 1044 (D. Mass. 1996) (citing *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 284-85 (1985)).  If a reasonable jury determined that Swaine *intentionally* hit Blanchard, his tort claims against the City arising from Swaine's conduct would necessarily fail.

or planning. *Harry Stoller & Co. v. City of Lowell*, 412 Mass. 139, 141 (1992). "[T]he dividing line should be between those functions that rest on the exercise of judgment and discretion and represent planning and policymaking[,] for which there would be governmental immunity[,] and those functions which involve the implementation and execution of such governmental policy or planning[,] for which there would be no governmental immunity." *Id.* at 142 (citing *Whitney v. Worcester*, 373 Mass. 208, 217 (1977)) (internal quotations and textual alterations omitted). The general rule is that there should be liability. *Id.*

Swaine's conduct in the cruiser clearly cannot be considered policymaking and planning, and accordingly section 10(b) is not a bar. *See Irwin v. Town of Ware*, 392 Mass. 745, 753 (1984) (police officer's decision to remove an intoxicated motorist from the roadway is not a policy or planning judgment).

Blanchard's claims for negligent "hiring, training, supervising, disciplining, and retaining" police officers present more difficult questions. Defendants point to *Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 101-02 (D. Mass. 2003), where the court suggested in dicta that "the decision to provide additional training [beyond the statutory minimum] may be a discretionary act for which the Massachusetts Tort Claims Act provides immunity." Depending on the circumstances, hiring, training, supervising, disciplining, and retaining police officers may all be policy determinations. City policymakers must make conscious decisions about the rules and standards governing these different aspects of the administration of a police department, and it is not the role of the Court to second-guess these decisions. On the other hand, section 10(b) does not bar litigation surrounding the *implementation* of those policies. Consider, for example, the question of whether a town should provide additional training to its officers. As long as the

town's employees have acted in accordance with its official training policy, the question of whether the policy itself should have provided for additional training would likely be protected as a discretionary function. If the plaintiff contends that the town's employees were actually *ignoring* the official policy, however, the discretionary function exception would likely not apply.

Applying that reasoning here, there is no evidence in the record that Bruwer or Roddy departed in any way from the LPD's official hiring and retention policies. Thus, the Court finds that Blanchard's claims for negligent hiring or retention are precluded by Mass. Gen. Laws. ch. 258 § 10(b).

Blanchard's negligent training, supervising, and disciplining claims, on the other hand, are supported by evidence that the LPD followed a less rigorous and unwritten practice of investigating its officers' use of force instead of the written policy. To the extent that Blanchard's claims attack the *implementation* of the official written policy, this divergence in practice from it is sufficient to place the City's employee's actions outside the scope of section 10(b).[21]

### iv. <u>Negligence Claims</u>

As noted, ch. 258 provides a remedy for claims resulting from the negligent conduct of public employees. "Negligence is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances." *Morgan v. Lalumiere*, 22 Mass. App. Ct. 262, 267

---

[21] The Court notes the lack of evidence or argument by either party regarding the way that official department policy was made and changed within the City hierarchy. The written policy appears to have been in force, though not followed, at the time of the accident. One would expect any legitimate policymaking decision—of the kind protected by the statute—to have resulted in a change to the written policy. Without more evidence that the move to an unwritten policy was an official change, the Court must draw the reasonable inference here that it was an implementation of the policy that falls outside the scope of Mass. Gen Laws ch. 258 § 10(b).

(1986).  Thus, to prevail on his claim against the City, Blanchard must show that the City's

employees—here, defendants Swaine, Bruwer, and Roddy—failed to exercise reasonable care.

A reasonable jury could find that Swaine failed to exercise reasonable care toward

Blanchard when he struck him with the police cruiser.  Even crediting defendants' version of

events, Swaine still took his eyes away from the road while driving down a narrow cemetery

road at 15-20 miles per hour.[22]  Based on these facts, a reasonable jury could find that Swain

failed to exercise reasonable care in driving his vehicle.  This is enough to put the question of

Swaine's negligence—and thus the negligence of the City—in issue.  Accordingly, defendants'

motion for summary judgment as to Blanchard's negligent conduct claim for Swaine's actions

will be denied.

Blanchard's remaining negligent training, supervision, and disciplining claims survive

summary judgment only insofar as they relate to the City's failure to follow its official, written

policy regarding use-of-force reporting.  A reasonable jury could find that the City was negligent

in its training, supervising, and discipline of officers if those activities were conducted in

accordance with an unwritten practice and in violation of the official policy.  Accordingly,

defendants' motion for summary judgment as to Blanchard's claims for negligent training,

supervision, and discipline will be denied.

   c.  **Supervisory Liability Claims Against Bruwer and Roddy**
      **(Counts 4 and 5)**

Blanchard contends that Sergeant Bruwer and Chief Roddy are liable for Blanchard's

---

[22] As noted above, if a jury were to determine that Swaine intended to stop Blanchard with the car, as Blanchard alleges, then the negligence claims against the City arising from Swaine's conduct would be barred. Because Swaine's intent is a question of fact, however, both the constitutional and negligence claims survive summary judgment.

injuries under a theory of supervisory liability.[23]  In the context of § 1983 actions, supervisor liability typically attaches if a supervisor is a "primary violator or direct participant in the rights-violating incident" or "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)).

The complaint alleges that Sergeant Bruwer "did not prevent [Swaine] from injuring Mr. Blanchard when [Swaine] held [him] to the ground with his foot, and such failure by Sergeant Bruwer amounted to negligent supervision."  (Compl. ¶ 96).  It also alleges that "[a]s a direct and proximate result of the reckless conduct of [Bruwer], [Blanchard] has suffered severe emotional trauma, humiliation, [sic] physical and psychological injuries."  (*Id.* ¶ 95).  The Court first addresses the merits of a direct violation claim against Bruwer and then analyzes his indirect violation claims against Bruwer and Roddy.

To the extent that Blanchard contends that Bruwer directly violated his rights, his claim cannot survive summary judgment.  The record is devoid of evidence that Sergeant Bruwer was even present when Swaine allegedly struck or placed his foot on Blanchard.  Furthermore, the undisputed testimony of several witnesses who arrived at the scene prior to Bruwer—including St. Cyr, Hartin, and one of the emergency medical personnel—is that Swaine was not doing so by the time of their arrival.  Because Bruwer was not present at the time that Swaine allegedly

---

[23] Count 5, which is styled "negligent supervision and *Monell*," also names the City of Leominster.  To the extent the allegations in Count 5 apply to the City, they are incorporated into the Court's *Monell* analysis. Defendants are also correct that any claim for "negligent supervision" against Bruwer or Roddy would be precluded by the Massachusetts Tort Claims Act.  Mass. Gen. Laws ch. 258 § 2 ("Public employers shall be liable for [injuries] caused by [negligence] of any public employee while acting within the scope of his office or employment . . . . [N]o such public employee . . . shall be liable [for injury] caused by his negligent or wrongful act or omission while acting within the scope of his office or employment . . .").

held Blanchard down with his foot, he could not have acquiesced or otherwise directly participated in that act. Accordingly, defendants' motion for summary judgment as to Blanchard's claims for supervisory liability against Bruwer will be granted to the extent he is alleging a direct rights violation.

The only remaining grounds for supervisory liability is that Bruwer and Roddy supervised, trained, or hired Blanchard with deliberate indifference toward the possibility that his deficient performance eventually might contribute to a civil rights deprivation. In this case, the analysis focuses on "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." *Sanchez*, 590 F.3d at 49.

Blanchard marshals three points in support of his claim for supervisory liability against Roddy and Bruwer. First, he notes that the LPD had no Internal Affairs Department, despite a staff of 95 persons. Second, he points to the LPD's widespread practice of failing to produce use-of-force reports, as required by the written policy. Finally, he points to Bruwer's failure to take measurements at the scene of the collision, his failure to inquire into Blanchard's injuries at the hospital, and other alleged deficiencies in his investigation of the collision.

As to Roddy, Blanchard has alleged sufficient facts to withstand a motion for summary judgment. As noted above, the apparent disparity between the written policy and unofficial practice at the LPD is sufficient to permit the claim to go forward. For analogous reasons, supervisory liability may lie against Roddy to the extent that he was in a position to influence police practice at the LPD. Although evidence of Roddy's control over LPD policy is sparse, it appears that there is sufficient evidence from which a reasonable jury could find the deliberate

indifference and causation necessary to sustain a claim for supervisory liability as to Chief Roddy.[24]  Accordingly, defendants' motion for summary judgment as to Blanchard's supervisory liability claims against Roddy will be denied.[25]

Although there is sufficient evidence to suggest that Roddy was in a position to affect the policy and practice of the LPD, there is no such evidence with regard to Sergeant Bruwer. Indeed, there is no indication that Bruwer's investigatory activities prior to the incident failed to conform to departmental practice.  Since Bruwer had no control over the policy and practices of the LPD, there is no way that he could have caused the disparity between written and unwritten policies that is the basis for supervisory liability here.  Nor can evidence that Bruwer's post-collision investigation was shoddy be a basis for liability.  The causation requirement can only be met by evidence that Bruwer acted to manifest deliberate indifference to potential rights violations on the part of his subordinates *before* the alleged rights violation occurred.  His actions after the fact cannot do so.  Accordingly, defendants' motion for summary judgment as to

---

[24] Although the record is devoid of evidence as to whether Chief Roddy had a role in the decision to abandon the written policy, there is evidence that he knew about the failure to follow it.  It is undisputed that Chief Roddy oversaw the LPD, and, without evidence to the contrary, it is reasonable to infer on summary judgment that he had some control over how the department conducted investigations.

As noted above, the parties have not made any arguments as to Chief Roddy's role within the policymaking machinery of the City of Leominster, although defendants have reserved the right to make this argument in the future.  The question is an important one for nearly all of Blanchard's surviving "policy and practice" claims.  The *Monell* claims turn in part on whether the widespread investigatory practices were known to or promulgated by someone with policymaking authority within the City hierarchy.  The ch. 258 claims turn somewhat in the opposite direction, with discretionary function immunity potentially arising if the move to the unwritten practices was an actual exercise of policymaking authority.  Finally, the supervisory liability claims against Roddy can only survive if Roddy caused the unwritten policies to come into being or he was aware that the written rules were not being followed and was in a position to change that behavior.

[25] Defendants assert that Roddy is entitled to qualified immunity for his actions.  The First Circuit has rejected the traditional qualified immunity analysis (discussed above) in cases of supervisory liability for indirect violations.  *See Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).  Instead, the proper analysis is "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort."  *Id.*  This is identical to the primary analysis of supervisory liability, and defendants' qualified immunity defense is not a bar for the same reasons.

Blanchard's supervisory liability claim against Bruwer will be granted.[26]

IV.     **Conclusion**

For the foregoing reasons,

1.      Blanchard's motion for leave to file a supplemental memorandum of law and statement of material facts is DENIED;

2.      Blanchard's motion to file a supplemental affidavit is DENIED as moot;

3.      Blanchard's motion to exclude expert testimony is DENIED without prejudice;

4.      Defendants' motion to strike is GRANTED in part and DENIED in part as set forth above; and

5.      Defendants' motion for summary judgment is GRANTED as to the negligent hiring and retention claims against the City in Count 3, GRANTED as to the failure to train claim against the City in Count 4, GRANTED as to the supervisory liability claims against Bruwer in Count 5, and DENIED as to all other claims.

**So Ordered.**

　　　　　　　　　　　　　　 /s/ F. Dennis Saylor_____
　　　　　　　　　　　　　　F. Dennis Saylor IV
　　　　　　　　　　　　　　United States District Judge

Dated:  November 29, 2010

_____

[26] Because the Court dismisses the claims against Bruwer on other grounds, it does not reach defendants' qualified immunity arguments as to those claims.